**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JUDITH VICICH,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**WALGREEN CO.,** )<br>)<br>**Defendant.** ) | **Case No. 11 C 2279** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Judith Vicich, who has multiple sclerosis, has sued her former employer,

Walgreen Co. (Walgreens), under the Americans with Disabilities Act (ADA).  Vicich

contends that Walgreens failed to provide a reasonable accommodation for her multiple

sclerosis and that it fired her in retaliation against her for exercising her rights under the

ADA.  Walgreens moved for summary judgment on both of Vicich's claims.  For the

reasons stated below, the Court grants Walgreens' motion with regard to the retaliation

claim but denies it with regard to the accommodation claim.

**Background**

Vicich first worked for Walgreens from 1968 through 1973.  She returned to

Walgreens several years later in 2000 as a staff pharmacist.  By the time she returned,

Vicich had been diagnosed with multiple sclerosis (MS).  Vicich worked as a pharmacist

in a number of different Walgreens locations before deciding in December 2007 to take

a permanent position as a staff pharmacist at a store in Warrenville, Illinois (Store

5712).  She remained there until she was fired on May 29, 2009.

Vicich worked indirectly underneath Scott Diveney, a district pharmacy supervisor for the west suburban district of Walgreens, the entire time she worked at Store 5712.  Dave Hauge was the pharmacy manager when Vicich first began at the store, but Abeir Heib took over the post in late 2008.  They were the only two full-time staff pharmacists at the store.  Sonal Vyas worked part-time as a staff pharmacist.  Other pharmacists would occasionally work at Store 5712 on a temporary basis, filling in for the staff as needed.  The store also had two full-time pharmacy technicians, Andrea Hedges and Barbara Zieneski.

During her deposition, Vicich testified that when she began working at Store 5712 in December 2007, she worked Sunday through Thursday every week.  At some point, however, Vicich's schedule changed, and she began working alternating six-day and four-day work weeks.  Vicich would work Sunday through Friday one week, followed by Monday through Thursday the following week.  Heib likewise worked an alternating schedule, and Vyas, the part-time pharmacist, worked every Friday and Saturday.

**A.    R.W.'s Prevacid prescription**

In January 2009, Vicich was working at Store 5712 with Hedges when a prescription for a two-year-old patient, R.W., was transferred to the store from another Walgreens store.  The prescription was for the drug Prevacid, used primarily to treat acid reflux and to prevent and treat ulcers.  R.W.'s prescription called for a liquid compound form of the drug, requiring the pharmacy to combine the medication with a liquid to create a liquid form of the drug that a young child can ingest.  The doctor's prescription called for a dose of fifteen milligrams of medicine per five milliliters of liquid

(15mg/5ml), but the Walgreens pharmacist who previously filled the prescription had calculated a preparation that would create a dose of twenty-five milligrams of medicine per five milliliters of liquid (25mg/5ml). The calculation thus called for a greater dosage of medication than the prescription authorized.

Hedges and Vicich discovered the inconsistency between the prescription and calculation when they refilled the prescription. Vicich testified that she called the prescribing physician's office and asked a nurse there to verify the prescription dosage. According to Vicich, the nurse placed her briefly on hold and then returned and instructed her to continue making the prescription at the 25mg/5ml strength. Walgreens does not dispute this for present purposes, although Diveney submitted an affidavit in which he stated that he "entertained serious doubts about whether Vicich actually called the doctor's office." Def. Ex. 15 at 4. Vicich admits that she did not record the name of the nurse to whom she spoke, although she contends that this is not uncommon. Def. Ex. 1 at 57. Vicich and Hedges prepared the medication at the 25mg/5ml strength, and Vicich rewrote R.W.'s prescription. Vicich testified, however, that she erroneously rewrote the prescription at the same 15mg/5ml strength. *Id.* at 54–55.

Walgreens policy requires that when an improperly processed or filled prescription leaves the pharmacy, a pharmacist must file a report through the company's Strategic Tracking and Analytical Reporting System (STARS report). Def. Ex. 15 at 219; Pl. Ex. 13. The policy also states that the pharmacy staff "should do all they can to correct the situation, ensure the customer's health and welfare, and satisfy the customer." Def. Ex. 15 at 219. Vicich filed a STARS report in January 2009, stating that she had verified the dosage with the prescribing physician at the 25mg/5ml level.

Vicich did not notify anyone of the incident verbally, including her supervisors or R.W.'s family. Diveney testified that he reviews all STARS reports filed in his district but admitted that he did no investigation regarding Vicich's January 2009 report. Walgreens retains STARS report for only one year before it purges them, and thus it has since destroyed Vicich's January report.

Diveney testified that R.W.'s prescription was filled a few times from January through April 2009, but the parties have submitted no evidence regarding who filled those refills or what dosage of the medication they contained. On April 24, 2009, R.W.'s prescription was again refilled at Store 5712. During her deposition, Vyas testified that she was reviewing the prescription data for R.W.'s prescription when she noticed the inconsistency between the calculations, which called for a 25mg/5ml suspension, and the prescription that Vicich had written, which called for a 15mg/5ml suspension. Vyas stated that she called the prescribing physician's office and verified that the prescription was supposed to be 15mg/5ml. She did not tell Vicich that she had contacted the doctor's office and confirmed the lower dosage.

When Vicich arrived for her shift later that day, Vyas told her that she had found an error in R.W.'s prescription and that she had corrected the calculation to the lower dosage. Vicich told Vyas that she was wrong, and she discarded the compound Vyas had prepared. She then remade the compound at the 25mg/5ml strength. Vicich prepared a new copy of the prescription, this time calling for a dosage of 25mg/5ml. She did not contact the prescribing physician's office again before reprinting the prescription. Vicich prepared a new STARS report, stating that she had made a documentation error in January when she wrote the prescription at the 15mg/5ml

dosage. She did not, however, notify R.W.'s family about the prescription order or indicate to them that there had ever been an issue regarding the Prevacid prescription. Walgreens has purged Vicich's April STARS report.

Vyas testified that when Vicich arrived for her shift on April 24, she took the documents Vyas had collected regarding R.W.'s prescription and "stated that she would take care of it." Def. Ex. 13 at 1. Vicich denies that she ever took any papers from Vyas. Vyas stated that she then brought the matter to Heib's attention. She testified that before she left the store that day, she collected "the original refill leaflet, a copy of the original prescription order and a STARS note stapled together" and left them for Heib to review. *Id.*; *see also* Def. Ex. 4 at 51–52.

After learning of the incident from Vyas, Heib asked Vicich about the prescription, and Vicich said that she had incorrectly written the dosage of 15mg/5ml on the prescription in January after she first received the prescription. Heib directed Vicich to contact the prescribing physician's office to confirm the dosage. Vicich left a message with the office. The physician's office later advised Heib that 15mg/5ml was, in fact, the correct dosage. Vicich testified that she told Heib and Vyas that Walgreens did not need to contact R.W.'s family and that doing so would only create a "[m]ulti-million dollar lawsuit." Def. Ex. 1 at 93.

When district pharmacy supervisor Diveney visited Store 5712 in May 2009, Heib told him about the Prevacid prescription incident. Diveney immediately instructed Heib to contact R.W.'s mother and the prescribing physician to inform them that R.W. had been receiving an incorrect dosage of the medication. Heib testified that she notified R.W.'s mother, although she could not remember whether she spoke with her in person

or over the telephone.  Vicich denies that Heib ever contacted the mother.  Diveney also asked Vyas and Heib (but not Vicich) to prepare written statements summarizing their involvement in the R.W. incident.  Vyas and Heib sent their written statements to Diveney on May 14, 2009.

Diveney and Walgreens' Loss Prevention Supervisor Mike Miller interviewed Vicich on May 26, 2009 at Store 5712.  Diveney stated in his affidavit that he did not interview Vicich earlier because he was on vacation from May 20 until May 25, 2009. During the interview, Vicich admitted to Diveney and Miller that she advised Vyas and Heib not to contact R.W.'s family regarding the incident.  She testified as follows during her deposition:

> Q.  Do you know whether Scott [Diveney] believed that you advised Sonal Vyas to not contact R.W.'s family?
>
> A.  Yes, he knew I advised both Sonal [Vyas] and Abeir [Heib].
>
> Q.  Not to contact?
>
> A.  Yes.

Def. Ex. 1 at 148–49.  The parties disagree on how long the interview lasted, and Vicich contends that Diveney was very hostile at the meeting.  Diveney accused Vicich of lying about having spoken to the prescribing physician's office in January 2009, in order to cover up her mistake.

Four days later, on May 29, 2009, Diveney e-mailed Vicich, stating that he was firing her because she "declined to notify a patient and her doctor that a prescription had been incorrectly filled" and had "advised another pharmacist not to contact the patient." Pl. Ex. 12.  Diveney also forced Heib to resign.  He submitted an affidavit stating that this decision was based on several factors:

> First, Heib did not timely notify the two-year[-]old patient's family about the Prevacid prescription error. . . .  Second, Heib was aware that Vicich had instructed her and Vyas not to contact the patient's family.  Third, Heib failed to alert me to the prescription error in a timely manner.  Taken together, I concluded these actions constituted concealment of the prescription error and warranted the end of her employment with Walgreens.

Def. Ex. 15 at 5–6.  Diveney stated that although he allowed Heib to resign because he did not feel her conduct was as "egregious" as Vicich's conduct, he would have fired her had she not resigned.  *Id.* at 5.

Diveney did not discipline Vyas for the incident.  He stated that he did not believe Vyas had concealed the error in any way and that she had "taken appropriate steps." *Id.*

**B.     Vicich's request for an accommodation**

In 2007, before working as a staff pharmacist at Store 5217, Vicich took two medical leaves of absence.  In March 2009, Vicich asked Diveney whether she could remain in one store if she worked only part-time.  Diveney told her that if she worked as a part-time pharmacist, she would be required to travel between Walgreen's locations to fill in for either planned or last-minute vacancies.  Vicich did not believe Diveney, but she did not pursue the part-time option further.

On May 14, 2009, the same day Heib and Vyas sent Diveney their statements regarding the R.W. prescription matter, Vicich e-mailed Diveney to request a schedule accommodation because she could no longer work six days in a row "for health reasons."  Pl. Ex. 9.  She told Diveney that she was required to avoid heat, fatigue, and stress and that she could no longer deal with the pain and spasticity that resulted from

working six-day weeks. Vicich offered to obtain a note from her neurologist and asked Diveney what her options were. *Id.*

The parties disagree thoroughly about what happened next. Vicich contends that Diveney called her at work and said simply, "[d]isability." Def. Ex. 1 at 114. When Vicich told him she did not think going on disability would be appropriate, Diveney responded that he had given her "everything you've ever asked for." *Id.* at 115. Vicich testified that Diveney did not offer her any other options in this phone call. Rather, she stated, Diveney called her a second time and told her that the only available option was to take one unpaid day off work every second week. *Id.* at 119. She told Diveney that she did not want to cut her hours, and he responded by asking her if it was about the money. *Id.* at 131. She told him she would have to think it over and then contacted employee relations to ask whether the proposed schedule would impact her full-time status or her benefits.

Diveney testified that he had only one telephone conversation with Vicich, which occurred on May 14. Def. Ex. 3 at 97. According to Diveney, when he received Vicich's request, he contacted an attorney in Walgreens' employee relations department to see what he could offer Vicich. Based on that discussion, Diveney said, he offered her three options: (1) she could take disability leave, Def. Ex. 2 at 62; (2) she could take one unpaid day off of work every other week, *id.* at 48–49; or (3) she could alter her schedule so that she would work one day every other week as a "floater," filling in at any store within the district that needed a pharmacist that day. *Id.* at 51–52. Diveney was already aware that Vicich wanted a schedule change so that she could work at Store 5712 for all ten days in the biweekly schedule. He stated, however, that he would not

change the schedule at store 5712 because Vyas "wouldn't switch the schedule due to her commitments with her family." *Id.* at 34. Diveney admitted that he did not discuss Vyas's schedule with her directly. Def. Ex. 3 at 45. He denied, however, that Vicich protested against taking an unpaid day off of work every other week. *Id.* at 101.

Later in the afternoon on May 14, 2009, Vicich e-mailed Diveney, stating that she would accept his offer of one unpaid day off every second week. Def. Ex. 10. She requested that she begin the next week. She also wrote: "I do not blame yourself [*sic*] or anyone else. You cannot know [how] much I appreciated your support this last year. I'm mad at myself." *Id.* One of Walgreens' floaters worked for Vicich on May 21, 2009, and Vicich was not paid for that day. As indicated above, Diveney fired Vicich on May 29, 2009, before her next scheduled unpaid day off.

On June 27, 2009, Vicich filed an application for Social Security disability benefits with the Social Security Administration (SSA). In her application, she stated that she "became unable to work because of [her] disabling condition on May 28, 2009." Def. Ex. 12 at 1. She did not file for any disability benefits, however, until July 27, 2009. Vicich explained that she waited to apply for disability because she tried to find another pharmacist position that accommodated her MS. When she was unable to find a job that met her needs, she applied for disability benefits, which the Social Security Administration approved in November 2009.

### Discussion

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In deciding a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment must be granted "[i]f no reasonable jury could find for the party opposing the motion." *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

Walgreens has moved for summary judgment on three grounds: (1) Vicich cannot establish a prima facie retaliation claim and alternatively cannot show that Walgreens' reasons for firing her are pretextual; (2) Vicich cannot prevail on a failure-to-accommodate claim as a matter of law; and (3) Vicich is estopped from establishing that she is a "qualified individual with a disability," as required by the ADA.

## A.     Retaliation claim

Vicich contends that Diveney terminated her in retaliation for asserting her rights under the ADA. A plaintiff may prove retaliation using either the direct or indirect method of proof. *See Hoppe v. Lewis Univ.*, 692 F.3d 833, 841 (7th Cir. 2012). To establish retaliation under the direct method, Vicich must present evidence, direct or circumstantial, showing that: (1) she engaged in activity protected under the statute; (2) she suffered a materially adverse action; and (3) there was a causal connection between the two. *Id.*; *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). The parties agree that Vicich's request for an accommodation constituted protected activity, and her termination was clearly an adverse employment action. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

For these reasons, the only remaining issue is whether Vicich has produced enough evidence of causation such that a reasonable jury could find that her request for an accommodation caused her termination. Because Vicich has produced no direct evidence of a "smoking gun" that would "prove the fact in question—the discriminatory intent—without reliance on inference or presumption," she must instead create "'a convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" to prevail under the direct method. *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009)).

Under the "convincing mosaic" analysis, courts have recognized three categories of evidence that (either separately or in combination) may allow a rational jury to infer unlawful retaliation. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). The first includes "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn." *Harper*, 687 F.3d at 307. The second category is evidence showing that "the employer systematically treated other, similarly situated, [non-protected] employees better." *Silverman*, 637 F.3d at 734 (internal quotation marks omitted). Finally, a plaintiff may show that the employer offered a pretextual reason for an adverse employment action. *Coleman*, 667 F.3d at 860.

The indirect method of proving retaliation uses the burden-shifting methodology described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case under the indirect method, Vicich must show that: (1) she is a member of a protected class; (2) she was meeting Walgreens'

legitimate expectations; (3) she suffered an adverse employment action; and (4) Walgreens treated similarly situated employees without a disability more favorably. *Dickerson*, 657 F.3d at 601–02. If Vicich establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 601 (7th Cir. 2009). Vicich must then provide evidence from which a reasonable jury could find that Walgreens' proffered reasons are pretextual. *Id.*

If the employer offers a legitimate and nondiscriminatory reason for firing the employee, a court may proceed directly to the issue of pretext without addressing the employee's ability to establish a prima facie case. *See Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999). Walgreens has met its burden; it contends that Vicich was fired for failing to contact a patient's family regarding a prescription errors and advising other pharmacists to do the same. The Court therefore proceeds to assess the issue of pretext.

"A plaintiff can establish pretext either directly, with evidence suggesting that retaliation or discrimination was the most likely motive for the termination, or indirectly, by showing that the employer's proffered reason was not worthy of belief." *Sanchez*, 188 F.3d at 746. Indirect proof of pretext would include evidence that: (1) Walgreens' explanation has no basis in fact; (2) the explanation was not the real reason for firing her; or (3) the reason stated was insufficient to warrant termination. *Worth v. Tyer*, 276 F.3d 249, 266 (7th Cir. 2001); *see also Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1063 (7th Cir. 2008) ("Showing pretext requires proof that the defendant's explanation is unworthy of credence.") (internal quotation marks omitted).

Vicich argues that the timing of her termination, Diveney's decision not to fire Vyas, and the lack of records from Diveney's investigation or interview with Vicich would permit a reasonable jury to conclude Walgreens' stated grounds were merely a pretext for unlawful retaliation. Vicich does not specify whether she is using the direct or the indirect method of proof. But because Vicich cannot prevail under either method, however, the Court will address her claim under both. *See Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("It seems to me that the time has come to collapse all these tests into one."); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 851 (7th Cir. 2010) (noting that the "similarly situated" and "pretext" analyses are substantially the same under both the direct and indirect method).

### 1. Suspicious timing

As to her "suspicious timing" evidence, Vicich relies on the fact that Diveney fired her on May 29, 2009, two weeks after she requested an accommodation for her MS, rather than taking action after he received her January 2009 or April 2009 STARS reports. "Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006). The only other evidence Vicich submits to show that the temporal proximity is indicative of retaliatory intent is Diveney's own inconsistencies regarding when he learned of the incident. Diveney testified at one point in his deposition that he did not discover that R.W.'s family had not been notified until May 12, 2009 but stated at another point that he directed Heib on April 27 to apologize to R.W.'s mother. This small factual issue is not material to Vicich's claim, however. *See Silverman*, 637 F.3d

13

at 735–36 (finding allegedly inconsistent testimony from employer insufficient to warrant denial of summary judgment because it was "not material" to plaintiff's claim). It is undisputed that Diveney did not know that Vicich had not notified R.W.'s family at the time she submitted her January or April reports because Vicich did not include that fact in either report. Whether Diveney learned of this failure in late April or early May is immaterial, given the fact that he investigated the matter and fired Vicich within, at most, one month of being made aware of it.

Additionally, Heib sent her written statement to Diveney one hour before Vicich made any accommodation request, indicating that Diveney had at least begun his investigation into the incident before Vicich ever made the request that she contends induced the retaliation. Even taking as true Vicich's claim that she filed reports in January and April of 2009, those reports would not have alerted Diveney to the grounds upon which Diveney says he fired her. Vicich admits that Diveney did not reference her accommodation request at any point during their meeting on May 26, 2009, nor did he mention her request when he fired her three days later. Vicich's "suspicious timing" argument is therefore not sufficient in and of itself to defeat Walgreens' motion for summary judgment. *See Silverman*, 637 F.3d at 736 (finding a two- to three-week interval insufficient to defeat summary judgment); *see also Coleman v. Donahue*, 667 F.3d at 861 ("Our cases reject any bright-line numeric rule, but when there is corroborating evidence of retaliatory motive . . . an interval of a few weeks or even months may provide probative evidence of the required causal nexus.").

### 2.    Similarly situated employees

Vicich next contends that because Vyas likewise never notified R.W.'s family of

the Prevacid prescription issue, the two are similarly situated and Diveney's failure to

fire Vyas thus implies retaliatory motives, rendering his stated reason for firing Vicich

pretextual.  Although there is no magic formula, courts typically require a plaintiff

alleging a similarly situated employee was given better treatment to "at least show that

the comparators (1) dealt with the same supervisor, (2) were subject to the same

standards, and (3) engaged in similar conduct without such differentiating or mitigating

circumstances as would distinguish their conduct or the employer's treatment of them."

*Coleman*, 667 F.3d at 847 (internal quotation marks omitted); *see also Silverman*, 637

F.3d at 742 ("[A]lthough the similarly situated inquiry is a flexible, common-sense one,

the comparators must be similar enough that any differences in their treatment cannot

be attributed to other variables.") (internal citations and quotation marks omitted).

Although Vicich and Vyas dealt with the same supervisor and were subject to the

same standards, the differences in the comparable seriousness are great enough to

warrant summary judgment in Walgreens' favor.  The Seventh Circuit, in *Burks v.*

*Wisconsin Department of Transportation*, 464 F.3d 744 (7th Cir. 2006), held that "in

order to show that a coworker is similarly situated to a terminated employee, the

employee must show that the other coworker had a comparable set of failings."  *Burks*,

464 F.3d at 751 (addressing plaintiff's prima facie retaliation case); *see also Rodgers v.*

*White*, 657 F.3d 511, 518 (7th Cir. 2011) ("[W]hen uneven discipline is the basis for a

claim of discrimination, the most-relevant similarities are those between the employees'

alleged misconduct, performance standards, and disciplining supervisor.").  Vicich's

termination letter stated that she was fired on two grounds: (1) not contacting the patient's family and prescribing physician, and (2) advising another pharmacist (Vyas) not to do so. Vicich admits that she told Diveney she had advised both Vyas and Heib not to contact R.W.'s family. Vyas did not engage in that sort of misconduct. Instead, Vyas urged Vicich (who told Vyas that she had been in contact with the prescribing physician) to call the patient's family to inform them of the prescription error. Vicich correctly argues that Vyas also did not inform R.W.'s family about the prescription error, but Vyas did bring the incident to her supervisor's attention, rather than simply filling out a form.

Additionally, Vicich's "similarly situated" argument is undermined by the fact that Diveney forced Heib's resignation. Diveney testified that he did this because Heib knew that Vicich had advised Vyas not to contact R.W.'s family but failed to tell Diveney about it sooner. Heib's termination only further supports the reason Diveney and Walgreens gave for terminating Vicich. Diveney considered Vicich's advice to Vyas not to contact the patient to be so egregious that he fired Vicich's supervisor for not immediately notifying him about that incident. In sum, no reasonable jury could conclude that Vicich and Vyas were similarly situated. *See Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012) ("In other cases in which a . . . plaintiff had some shortcomings in common with a better-treated [non-protected] employee but was terminated for additional, distinct performance problems, we have found the comparator employee not similarly situated."); *Burks*, 464 F.3d at 751–52 (finding employees who have only one of three instances of misconduct in common not similarly situated for purposes of a prima facie analysis).

### 3. Lack of investigation records

As a final matter, Vicich contends that the lack of any notes of Diveney's alleged investigation and Walgreens' failure to retain her STARS reports are suggestive of a "cover-up of discrimination." Pl.'s Resp. at 15. Vicich has made no effort, however, to establish or argue the elements of an adverse inference based on spoliation with regard to the STARS reports, so she has forfeited that point. And no reasonable jury could infer from Diveney's failure to take notes that his claimed basis for terminating Vicich was pretextual. (There is, in fact, some documentation of Diveney's investigation, namely the written statements he obtained from Vyas and Heib.)

In summary, the evidence that Vicich has presented would not permit a reasonable jury to infer that Walgreens retaliated against her, nor would it permit a reasonable jury to conclude that Diveney's proffered reasons for firing Vicich were false or unsupported or otherwise pretextual. Because Vicich cannot present a "convincing mosaic" of circumstantial evidence sufficient to infer retaliation nor can she rebut Walgreens' legitimate non-discriminatory reason for firing her, Walgreens is entitled to summary judgment on Vicich's retaliation claim.

### B. Accommodation claim

Vicich's other claim is that Walgreens did not make a reasonable accommodation for her MS in May 2009. "Under the ADA, a failure to make reasonable accommodations for a known disability constitutes unlawful discrimination." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (citing 42 U.S.C. § 12112(b)(5)(A), 12112(a)). To establish a claim under the ADA for failure to accommodate, Vicich must show that: "(1) she is a qualified individual with a disability; (2) the employer was aware

of her disability; and (3) the employer failed to reasonably accommodate the disability."
*Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011); *see also Stevens*

*v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000). Walgreens admits that

Vicich's supervisors were aware she had MS. It contends, however, that it provided

Vicich with a reasonable accommodation. Alternatively, Walgreens argues that Vicich is

estopped from arguing that she is a qualified individual with a disability as the ADA

defines that term, by virtue of her application for Social Security disability benefits.

### 1. The accommodation

When a worker with a disability has communicated her disability to her employer

and asked for an accommodation so she can continue working, "the employer has the

burden of exploring with the worker the possibility of a reasonable accommodation."

*Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). This interactive process is

not an end in itself but rather "a means for determining what reasonable

accommodations are available to allow a disabled individual to perform the essential job

functions of the position sought." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16

(7th Cir. 2000); *see also Mobley*, 531 F.3d at 546 (an employer's failure to engage in

the interactive process is insufficient to establish a failure to accommodate claim if it

eventually provided the employee with a reasonable accommodation).

Walgreens contends that Vicich's only goal in requesting an accommodation was

to avoid working six days in a row, irrespective of the cost. Walgreens further contends,

citing Diveney's testimony, that it gave Vicich three different options that would achieve

this goal—disability leave, a "floater" shift, and one day of unpaid time off every other

week. Vicich, by contrast, contends that she wanted Diveney to modify her schedule at

Store 5712 so that she could remain a full-time staff pharmacist there but work five-day work weeks. She contends that when Diveney called her on May 14, he told her that her only option, other than going on disability leave altogether, was to take unpaid time off every other week. Vicich says that she accepted this accommodation only because based on Diveney's actions, her only choices were to go on "disability, quit, or accept that offer." Def. Ex. 1 at 128. Vicich argues that because Diveney's only offered accommodation required her to take a ten percent cut in pay and was revocable at Diveney's discretion, it was unreasonable.

An employer is not obligated to provide an employee the particular accommodation she requests or prefers. *Gratzl v. Office of the Chief Judges*, 601 F.3d 674, 681 (7th Cir. 2010). The ADA does not, however, give employers "unfettered discretion to decide what is reasonable." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 199 (7th Cir. 2011). The Court concludes that there are genuine issues of material fact surrounding Vicich's failure-to-accommodate claim. Walgreens does not contend that Vicich was unable to perform the essential functions of a full-time staff pharmacist because of her MS. Vicich did not contend in her request for an accommodation that she could not work a full-time schedule, only that she could not work six days in a row. Moreover, Vicich testified that Diveney never offered her the opportunity to work a "floater" shift every other week to ensure that she would not lose pay. Finally, Vicich alleges that Diveney was quite hostile in response to her accommodation request and presented her with a take-it-or-leave-it accommodation proposal.

Thus, viewing the record in the light most favorable to Vicich, the Court concludes that a reasonable jury could find that Walgreens failed to engage in the

interactive process required by the ADA and the sole accommodation it offered was

unreasonable.  *See Hoppe*, 692 F.3d at 840 ("An employer can take no solace in its

failure to engage in this [interactive] process in good faith if what results is an

unreasonable or inappropriate accommodation offer.").

###    2.    Estoppel

Walgreens alternatively argues that Vicich is estopped from arguing that she is a

qualified individual with a disability based on her representation to the Social Security

Administration that she was unable to work as of May 28, 2009—one day before

Diveney terminated her.  In support of its argument, Walgreens relies on *Cleveland v.*

*Policy Management Systems Corp.*, 526 U.S. 795 (1999).

The Supreme Court in *Cleveland* rejected the kind of automatic disqualification

that Walgreens argues this Court should apply in the present case.  *See, e.g., id.* at

802–03; *see also Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005)

("*Cleveland . . .* holds that receipt of Social Security disability benefits does not

automatically disqualify a person from making a claim under the [ADA].").  *Cleveland*

and its progeny instead require an ADA plaintiff who has obtained Social Security

disability benefits by representing that she cannot work to "confront and reconcile the

apparent inconsistency between that assertion and [her] ADA claim" by reference to the

different definitions of "disability" in the relevant statutes.  *Lee v. Salem*, 259 F.3d 667,

673 (7th Cir. 2001).

Vicich has given the requisite explanation.  She contends that her statements to

the Social Security Administration about being unable to work were made without

reference to the accommodation she requested from Diveney.  If she had received the

accommodation she requested—a full-time schedule that included no more than five consecutive days of work—she would have been able to work, and thus she was able to perform the essential functions of her job for purposes of her ADA claim. This explanation, which directly references the divergent definitions of "disability" under the two schemes, is exactly the type of explanation approved in *Cleveland*. *See id.* at 674–75; *Gittings v. Tredegar Corp.*, No. 08 C 4972, 2010 WL 4930998, at *5 (N.D. Ill. Nov. 29, 2010) (finding no judicial estoppel when plaintiff's explanation referenced the differing definitions of "disability" within the two schemes).

Moreover, Vicich was not awarded Social Security disability benefits until November 2009, well after her employment at Walgreens had ended. The Supreme Court in *Cleveland* noted that where a party has only applied for, but has not received, Social Security disability benefits, "any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Cleveland*, 526 U.S. at 805. Thus, the doctrine of estoppel does not prevent Vicich from succeeding on her reasonable accommodation claim.

### Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment with regard to plaintiff's retaliation claim but denies it with regard to her accommodation claim [docket no. 37]. The case is set for a status hearing on November 13, 2012 at 9:30 a.m. to set a trial date and discuss the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 2, 2012